**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CLAIR M. BRANCH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-1953 |
| | § | |
| CEMEX, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

This is an age discrimination suit.  The plaintiff, Clair M. Branch, worked as a regional manager for CEMEX, Inc. and Rinker Materials Corporation ("CEMEX").[1]  CEMEX terminated Branch's employment as regional manager and entered into a one-year consulting agreement with him that was not renewed.  Branch alleges that the defendants terminated his employment agreement and ended the consulting arrangement because of his age.  (Docket Entry No. 4).  CEMEX has moved for summary judgment. (Docket Entry No. 20).  Branch has responded, CEMEX has replied, and Branch has surreplied.  (Docket Entry Nos. 21–22, 24).  CEMEX has also moved to strike some of Branch's summary judgment evidence, and Branch has responded to that motion.  (Docket Entry Nos. 23, 25).[2]

Based on the motions and related filings, the record, and the applicable law, this court grants CEMEX's motion for summary judgment and denies as moot its motion to strike.  Final judgment is entered by separate order.  The reasons for these rulings are explained below.

---

[1] Branch appears to have been hired by Hydro Conduit/CSR, a predecessor company to Rinker Materials, which itself is a predecessor company to CEMEX.  Because of the close relationship between the companies, the defendant-employer is referred to as CEMEX.  The parties agreed to dismiss Rinker Materials from this lawsuit.  (Docket Entry No. 6).

[2] Because CEMEX is entitled to summary judgment even if this court considered the objected-to evidence, CEMEX's motion to strike is denied as moot.

I.      **Background**

CEMEX supplies building materials.  In January 1985, CEMEX hired Branch as a general manager.  Branch, who was born on March 30, 1937, was 47 at the time.  Two years later, in 1987, CEMEX promoted Branch to regional manager.  (Docket Entry No. 20, Ex. F).  On August 1, 2001, Branch and CEMEX signed an Employment Agreement under which Branch would be the "General Manager Hydro Conduit Houston," reporting directly to the "Southern Region Manager, Hydro Conduit Division."  (Docket Entry No. 20, Ex. A, ¶ 2).  The parties refer to this position as the "regional manager" position.  Under the 2001 Employment Agreement, Branch was responsible for "sales and production, bottom line profit, and market share" for CEMEX's facilities in the Houston market.  (*See* Docket Entry No. 20, Ex. C, at 32–37).  The Agreement stated that Branch's employment would end on July 1, 2004 but would automatically extend annually unless either Branch or CEMEX gave 180 days' notice of intent not to extend.  (Docket Entry No. 20, Ex. A, ¶ 1).  The Employment Agreement also specified what benefits Branch would receive if CEMEX terminated his employment or he resigned, including retirement and salary continuation benefits.  (*Id.*, ¶ 4).

From 1996 through 2001, Branch reported directly to Ron Metzger, who then served as vice president of sales and marketing.  Metzger's title later changed to chief operating officer of CEMEX's concrete pipe division.  (Docket Entry No. 20, Ex. G, at 10–11, 22–24).  After 2001, Metzger did not directly supervise Branch.  Beginning in December 2007, Branch reported to Francisco Aguilera, vice president and general manager for CEMEX's concrete pipe division.  (Docket Entry No. 20, Ex. H, at 9, 13).  In 2008, Metzger's title reverted to vice president of sales

and marketing, but his responsibilities remained the same.  (*See* Docket Entry No. 20, Ex. G, at 10–11, 22–24).

Undisputed evidence shows that Branch performed well under the Employment Agreement for an extended period.  Metzger testified that Branch was a "productive employee" from 1996 through 2001.  (Docket Entry No. 20, Ex. G, at 23).  Branch's 2007 performance evaluation stated that he was "clearly performing to expectations and exceeding requirements often."  In 2008 and 2009, Branch was evaluated as "on target," "above target," or "significantly above target" in meeting his performance objectives.  (Docket Entry No. 21, Ex. C, ¶ 5).

Metzger testified that he became concerned about Branch's work beginning in 2008. Metzger believed that Branch did not show "any great in-depth knowledge" about matters for which he was responsible and was not as interested in the business as he had been in the past.  Metzger was also concerned that Branch might be providing him inaccurate information.  (Docket Entry No. 20, Ex. G, at 39–42, 46–47).  Metzger voiced these concerns to Aguilera several times.  Metzger also told Branch at least once that he was worried about getting inaccurate information.  (*Id.*, at 39–42, 50–51; *see also id.*, at 46).  At least one employee who worked under Branch, however, testified that he saw no decline in Branch's work performance during this period.  (Docket Entry No. 21, Ex. O, at 11).

In mid-2008, Aguilera took steps to terminate Branch's Employment Agreement.  On July 29, 2008, he e-mailed Marla Roberson, CEMEX's vice president for human resources, stating his desire to make a termination offer to Branch.  Aguilera wrote that he had three goals in making this offer: first, keeping Branch involved with CEMEX for one year after the termination to help Branch's customers in the transition to working with others at CEMEX; second, ensuring a

noncompete period of at least 18 months; and third, providing Branch with "good terms, and fair to what it was established in his employment contract."  Aguilera asked Roberson to submit a proposed termination offer consistent with these goals as soon as possible.  Aguilera concluded the e-mail by writing: "We still have Ron [Metzger]'s, and Mike Shook's contracts which should be next on the list.  Now, my priority is Clair."  (Docket Entry No. 21, Ex. H).  At the time, Branch was in his seventies, Metzger in his sixties, and Shook in his fifties.  (Docket Entry No. 21, Ex. C, ¶ 3).

During his deposition, Aguilera cited numerous reasons for deciding to terminate Branch's Employment Agreement.[3]  They included the following:

- Branch "was difficult to manage due to his strong personality."

- Branch did not demonstrate a clear understanding of the production side of the business, which he was responsible for overseeing.

- Branch did not adequately engage in efforts or plans to reduce production costs.

- Branch was not actively participating in ensuring safety at the CEMEX plants under his supervision.

- Branch was mismanaging (or ignoring) one of these plants.

- Branch had engaged in "questionable management practices" by allowing relatives to work in the same chain of command.

- Branch missed an important meeting of regional managers in July 2008 to go on vacation.  Though Aguilera told Branch it was "okay" for him to miss the meeting, the meeting had been organized in May and Branch had waited until June to ask if he could take his planned vacation.

(*See* Docket Entry No. 20, Ex. H, at 42–51, 89–90).

---

[3]Though Branch's counsel attempted to organize the reasons by numbering them during the deposition, some of the separately numbered reasons overlap.

4

Aguilera also emphasized that because of the bad economic climate, CEMEX was reducing its workforce and looking for ways to cut costs and improve profitability.  (*See id.*, at 51–55).  As part of a reduction in force, CEMEX consolidated its regions from twelve to nine, demoting three regional managers to general managers in the process.  (*Id.*, at 58).  CEMEX's reduction in force and need to cut costs and increase profits were additional reasons for Aguilera's decision to terminate Branch's employment.  Aguilera testified that he shared these reasons with Roberson.  (*Id.*, at 62–65).  Aguilera also testified that he had told Branch more than once about the need to reduce production costs.  (*Id.*, at 41–42).

On December 23, 2008, Aguilera sent Branch a letter, which reads in relevant part as follows:

> As we discussed, this letter serves as formal notice that Cemex, Inc. is terminating your Employment Agreement, as amended, when the employment period expires on July 1, 2009.  The Date of Termination shall be July 1, 2009.
>
> Although your employment will terminate next year, you have several obligations which will continue after your employment ends.  Under Section 7 of the Employment Agreement, for a period of eighteen months following the Date of Termination (until December 31, 2010), you cannot compete with Cemex, solicit Cemex employees, divulge confidential information or disparage Cemex.  I enclose a copy of the Employment Agreement for your review.
>
> Cemex is interested in retaining you as a consultant following the termination of the Employment Agreement.  We propose that the consulting arrangement have an initial 12-month duration, subject to extension if mutually agreeable.  If you are interested in this arrangement, we will formalize it with a written Consulting Agreement prior to July 1, 2009.

(Docket Entry No. 20, Ex. B).

After receiving this letter, Branch told Aguilera "that [he] was not interested in retiring and that as long as [his] health was good [he] would like to continue to work as long as [he] could."[4] Branch did not recall Aguilera's response.  (Docket Entry No. 20, Ex. C, at 43).  Branch testified that he had previously told Aguilera and Metzger at least half a dozen times that he did not want to retire and instead wanted to continue working under the Employment Agreement as long as he remained in good health.  (Docket Entry No. 20, Ex. C, at 125).[5]  Metzger testified that he was neither involved in nor consulted about the decision to terminate Branch's Employment Agreement.  (Docket Entry No. 20, Ex. G, at 34–35).

On May 15, 2009, in response to Branch's inquiry about what benefits he was eligible to receive, Roberson wrote a letter explaining the benefits detailed in paragraph four of Branch's Employment Agreement.  She explained that the benefits included 18 months of salary continuation "[f]rom the date of termination."  (Docket Entry No. 20, Ex. D).  On June 25, 2009, a week before the Employment Agreement was to end, a human resources manager e-mailed Branch to have him complete an exit-interview form.  (Docket Entry No. 20, Ex. E).

On July 1, 2009—the termination date listed in the December 2008 letter from Aguilera—Roberson sent an e-mail to CEMEX's concrete pipe division announcing that, "[a]fter more than 25 years, Clair Branch is retiring."  The e-mail also announced that Metzger—who was

---

[4]Aguilera denied asking Branch any question about his retirement plans, such as when he planned to retire. Aguilera stated that his conversations about Branch's possible plans for retirement were limited to CEMEX's human resources and another executive.  (Docket Entry No. 20, Ex. H, at 59–61).  On summary judgment, disputes in the evidence are resolved in the light most favorable to Branch.

[5]Metzger denied ever having any conversations with Branch about his plans to retire.  (Docket Entry No. 20, Ex. G, at 37–38).  Again, on summary judgment, disputes in the evidence are resolved in the light most favorable to Branch.

6

then 60, 13 years younger than Branch[6]—would assume Branch's regional manager position in addition to continuing as vice president.  (Docket Entry No. 20, Ex. J).

Also on July 1, 2009, Branch and CEMEX entered into a Consulting Agreement.  Aguilera signed the Consulting Agreement for CEMEX.  In relevant part, that Agreement stated as follows:

> 1.  **Consulting Relationship —** Beginning July 2, 2009 through July 1, 2010 (the "Consulting Term"), Company [CEMEX] hereby retains Consultant [Branch], and Consultant hereby agrees to be retained by Company, as an independent contractor, and not as an employee. . . .

> 3.  **Compensation —** During the Consulting Term, Company agrees to pay Consultant for his services performed under this Agreement at the rate of $80 per hour, but only if services are actually rendered hereunder.

> Consultant shall also be entitled to reimbursement for reasonable and necessary expenses, except for automobile costs and expenses, incurred by Consultant relating to any services requested to be performed hereunder.  Costs and expenses related to the use of Consultant's personal automobile in the performance of said services shall be reimbursed at the then current IRS standard mileage rate per business mile.  Consultant shall not be entitled to participate in or receive benefits under any Company programs maintained for its employees, including, without limitation, life, medical and disability benefits, pension, profit sharing or other retirement plans, or other fringe benefits except those benefits to which Consultant became vested while an employee. . . .

> 7.  **Termination —** This Agreement may be terminated in accordance with the provisions set forth below.

> (a)  This agreement may be terminated by Consultant or Company with or without cause

---

[6](Docket Entry No. 21, at 19).  "Plaintiff urges he was actually replaced by Steve Gumina, 43 years of age based on an email instructing him to direct any customer inquiries to Mr. Gumina as of April 30, 2010."  (*Id.*, at 19 n.58).  The record clearly shows that Metzger assumed Branch's regional manager duties on July 1, 2009.

or reason by not less than ten (10) days prior written notice being given to the other party.

**(b)**     Company may terminate this Agreement at any time upon oral or written notice to consultant if **(i)** Consultant breaches any provision of this Agreement or **(ii)** Consultant engages in conduct which, in the reasonable judgment of the Company, is injurious to any aspect of Company's business, prospects, or operations.

**(c)**     In the event of Consultant's inability for any cause or reason to perform the services requested hereunder, this Agreement shall terminate as of the first date of such inability to perform. . . .

**9.**     **Complete Agreement —** This Agreement represents the complete Agreement between Company and Consultant concerning the subject matter hereof and supersedes all prior agreements or understandings, written or oral concerning the subject matter hereof.  No attempted modification or waiver of any of the provisions hereof shall be binding on either party unless in writing and signed by both Consultant and Company.  This Agreement does not in any way affect the obligations of the parties subject to the Employment Agreement dated as of August 1, 2001, as amended. . . .

(Docket Entry No. 20, Ex. I).

Although the Consulting Agreement stated that it was to last for one year and did not address renewal, Branch testified that he "was told that . . . the company could renew it as long as [his] performance continued to be satisfactory," and that he relied on that representation in signing the Agreement.  (Docket Entry No. 21, Ex. C, ¶ 7).  The December 23, 2008 termination letter from Aguilera to Branch stated only that the Consulting Agreement had an "initial 12-month duration, subject to extension if mutually agreeable."  (*See* Docket Entry No. 20, Ex. B).  Metzger testified

that he understood that Branch's Consulting Agreement could be extended beyond the 12-month term.  (Docket Entry No. 20, Ex. G, at 63).

In May 2009, Metzger had prepared a document providing a "General Overview on Responsibilities" for Branch under the then-proposed Consulting Agreement.  (*Id.*, at 75; Docket Entry No. 21, Ex. I).  These tasks included preparing sales plans and call lists and attending meetings.  Some of the tasks were to be carried out on a regular basis; others were to be done on CEMEX's request.  Branch was expected to work no more than 50 hours per month under the Consulting Agreement.  (*See* Docket Entry No. 21, Ex. I).

As a consultant, Branch used the same office and equipment at CEMEX he had used while working under the Employment Agreement.  (Docket Entry No. 20, Ex. G, at 91; Docket Entry No. 21, Ex. D, at 41).  He also continued to use the same CEMEX business card he had used before. (Docket Entry No. 20, Ex. C, at 105–06).  According to Branch, his job responsibilities under the Consulting Agreement were no different from his responsibilities under the Employment Agreement. (*Id.*, at 55–56; Docket Entry No. 21, Ex. C, ¶ 2).

Branch understood that CEMEX was limiting him to working 50 hours per month.  (Docket Entry No. 20, Ex. C, at 64–65).  According to Metzger, he and Aguilera set this monthly target. Metzger testified that when the Consulting Agreement began, Branch worked over 50 hours but did not bill CEMEX for the extra time.  Metzger asked Branch to send him an additional invoice for those hours but in the future "to manage his time to a rough average of 50 hours" or to ask for permission to go over.  (Docket Entry No. 20, Ex. G, at 75–78).

Branch testified that he controlled his work schedule under the Consulting Agreement. (Docket Entry No. 20, Ex. C, at 106).  He also testified that Metzger and Aguilera told him the tasks

they wanted him to accomplish.  (*See id.*, at 140–42).  Branch refused to do at least one task he was

asked to perform—preparing a list of customers and a plan to enhance the relationship between those

customers and Metzger—because he believed it was "asinine."  (Docket Entry No. 20, Ex. C, at 65).

Branch did not prepare a call plan for customers because he did not believe it to be "necessary."

(*Id.*, at 66).  He testified that he did not perform other tasks because he was not specifically asked

to do so.  (*Id.*, at 67–70).

Branch testified that during the time he worked as a consultant, "members of the sales force"

made age-related comments, referring to him "frequently as an 'old gray fox.'"  Some of these

remarks were made in meetings Metzger attended, but he took no action.  (Docket Entry No. 21, Ex.

C, ¶ 4).  Branch testified that other coworkers "sa[id] things about [his] white hair and being old,"

but he could not recall when such remarks were made.  (Docket Entry No. 20, Ex. C, at 126).

Sometime before April 30, 2010, Aguilera told Branch to stop working under the Consulting

Agreement and decided not to renew or extend the Agreement when it expired on July 1, 2010.

(Docket Entry No. 20, Ex. G, at 92; Ex. H, at 80–81).  Metzger testified that he had recommended

extending the Agreement, but Aguilera had disagreed.  (Docket Entry No. 20, Ex. G, at 63).

Metzger repeatedly stated that the decision to terminate the Consulting Agreement was Aguilera's

alone.  (*Id.*, at 35, 92).  On April 30, Metzger e-mailed Branch, with copies to Aguilera and Steve

Gumina, stating: "This is to confirm that beginning tomorrow there will be no need for you to

contact any customer on Rinker's behalf.  Should a customer call about any Rinker business matter

please refer them to Steve Gumina.  Should we require you[r] services over the next two months I

will contact you."  (Docket Entry No. 20, Ex. O).

Aguilera gave three reasons for his decision:

- During a CEMEX cement division meeting, Branch called a "top executive[] for one of our largest customers in cement" a "snake," which Aguilera found "completely not appropriate."

- Aguilera did not believe that Branch was effectively carrying out the purpose of the Consulting Agreement: to help his CEMEX and its customers in the transition to working with other members of CEMEX's sales force.

- Aguilera had heard reports that Branch was talking about, and criticizing, CEMEX to competitors and was planning to compete against CEMEX, which would violate his contractual nondisclosure and noncompete obligations.

(Docket Entry No. 20, Ex. H, at 67–71).  Aguilera testified that he had previously told Branch that the "snake" remark was inappropriate.  Aguilera could not recall whether he had warned Branch that he was not adequately carrying out the planned transition work.  (*Id.*, at 74).

According to Branch, despite the April 2010 e-mail stating that there was no need for him to continue to provide consulting services, he continued to "call[] on customers" through December 2010, paying the expenses himself.  (Docket Entry No. 20, Ex. C, at 113–16).  Metzger testified that CEMEX received no invoices from Branch after April 2010, but that CEMEX continued to pay him for 40 hours per month through the Consulting Agreement's termination date of July 2010.  (Docket Entry No. 20, Ex. G, at 97).

On January 5, 2011, Branch filed an EEOC age discrimination charge against "RINKER-CEMEX," stating as follows:

> I began my employment on January 5, 1985, General Manager and promoted to Regional Manager in 1987.  I remained in that capacity up until my discharge on December 31, 2010. Throughout 2009, I was asked by Francisco Aguilar (President) whether or not I was going to continue my employment or retire.  I also made it clear to him that I wanted to work for 2 to 3 more years, so long as my health would allow it.  In June 2010, I was advised by Mr. Aguilar that my contract with Rinker would expire on December 31, 2010 and it would not be renewed.

11

> Mr. Aguilar provided me no reason for not extending or renewing my contract, just suggested that Rinker was letting me go. I believe that I was let go due to my age, my performance was outstanding and I made a lot of money for the company throughout the last several years. The individual who replaced me was 42 years old with much less experience than I had.
>
> I believe that I have been discriminated against due to my age, in violation of The Age Discrimination in Employment Act of 1967.

(Docket Entry No. 20, Ex. F).

Branch says that he did not believe that his employment was being terminated until December 31, 2010. (*E.g.*, Docket Entry No. 20, Ex. C, at 44, 56; Docket Entry No. 20, Ex. F). The evidence does not support this argument. For example, Branch was asked at his deposition why he did not call Roberson to correct her after she had sent the July 1, 2009 e-mail announcing his retirement and Metzger's assumption of the regional manager position if he believed that he remained the regional manager. Branch responded that he "didn't think [he] had the authority to do that. . . . [b]ecause [he] had been terminated." (Docket Entry No. 20, Ex. C, at 59–60). In addition, on August 10, 2009, Branch submitted a Benefit Election Form to receive his pension. (Docket Entry No. 20, Ex. K). Branch testified that he knew he was eligible to receive his pension only after he was no longer an employee. (Docket Entry No. 20, Ex. C, at 75–76).

On February 28, 2011, Roberson formally responded to the EEOC charge by letter to the investigator assigned to Branch's charge. Roberson denied Branch's claim that CEMEX had discriminated against him in terminating his employment. She also denied Branch's claim that he was replaced by Gumina. She explained that his "former position as Regional Manager, Houston was not backfilled with another candidate. The Regional Manager, Houston position was assumed by the Vice President, Sales & Marketing, Ronald W. Metzger ("Metzger"). . . . Significantly, Mr. Metzger's age is sixty (60) years old." (Docket Entry No. 21, Ex. N, at 1). Roberson stated that

Branch's Employment Agreement gave CEMEX had the right to terminate his employment and that CEMEX had done so in a December 23, 2008 letter from Aguilera to Branch.  She also explained that CEMEX "retained [Branch] as an independent contractor beginning on July 2, 2009 through July 1, 2010, the termination date specified in the Consulting Agreement."  She concluded that the reason for ending Branch's Employment and Consulting Agreements was not age discrimination, but rather "the clear terms of his Employment and Consulting Agreements."  (*Id.*, at 2).

On April 5, 2011, the EEOC investigator e-mailed Branch, informing him that the EEOC lacked jurisdiction to investigate his discrimination claims against CEMEX.  The e-mail stated that the discrimination claim over the termination of the Employment Agreement was untimely, because "[his] employee to employer relationship ended on July 1, 2009 and would be considered outside the EEOC's 300 day jurisdictional guidelines to file a charge."  Even if the EEOC could investigate this claim, the e-mail continued, it would be difficult to conclude that age was the motivating factor for the discharge because the position was not filled by a person outside the protected category.  Instead, Metzger assumed the position in addition to existing responsibilities, and Metzger "was well within the protected age category (40+)."  The e-mail also stated that the EEOC lacked jurisdiction over the claim that terminating the Consulting Agreement was discriminatory because, under that Agreement, Branch worked as an independent contractor.  (Docket Entry No. 20, Ex. P).

Branch filed this lawsuit on May 23, 2011.  (Docket Entry No. 1).

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine

issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks omitted). "'If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response.'" *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and explain how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008). Nevertheless, "[i]f a party fails to properly support an assertion of fact fails to properly address

14

another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."  FED. R. CIV. P. 56(e)(2).

## III.    Analysis

Branch appears to assert two ADEA claims.  The first is over the 2009 termination of his Employment Agreement; the second is over the 2010 termination of his Consulting Agreement. Branch also asserts fraud and fraudulent-inducement claims based on his signing of the Consulting Agreement.  CEMEX has moved for summary judgment on all of these claims.  The arguments and responses are analyzed below.

### A.    The ADEA Claims

#### 1.    The 2009 Termination of Branch's Employment Agreement

The threshold issue is CEMEX's argument that Branch's ADEA claim based on the 2009 termination of his Employment Agreement is barred because he failed to file a timely EEOC charge. (*See* Docket Entry No. 20, at 11–13).  Under the ADEA, an employer may not "fail or refuse to hire or . . . discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a)(1).  Before pursuing an ADEA claim in federal court, an employee must first exhaust available administrative remedies.  *See id.* § 626(d)(1); *Julian v. City of Houston*, 314 F.3d 721, 725 (5th Cir. 2002).  "For cases arising in Texas, a complainant must file within 300 days of the last act of discrimination."  *Julian*, 314 F.3d at 726 (citing 29 U.S.C. § 626(d)(2)).  For Texas employees who have been terminated, "the [300]-day limitations period begins on the date of notice of termination, rather than the final date of employment."  *Phillips v. Leggett & Platt, Inc.*, 658 F.3d 452, 456 (5th Cir. 2011) (internal quotation marks omitted).  "The existence of notice is based upon an objective standard, focusing upon when the employee knew, or reasonably should have known,

15

that the adverse employment decision had been made." *Id.* (internal quotation marks omitted). "The notice of termination must be unequivocal to start the running of the limitations period." *Id.* "The limitations period begins when an employee is unambiguously informed of an immediate or future termination." *Id.*

The limitations period is not jurisdictional. Equitable tolling may apply. *Id.* at 457. In his response opposing summary judgment, Branch did not address his 2009 termination as regional manager. Instead, he only addressed the 2010 termination of his Consulting Agreement. (*See generally* Docket Entry No. 21). In its reply, CEMEX contended that Branch abandoned his ADEA claim over his 2009 termination as regional manager. (*See* Docket Entry No. 22, at 2). Branch filed a surreply in which he appeared to acknowledge that he untimely filed the EEOC charge over this termination but asserted that he is entitled to equitable tolling. Branch cited his belief that he remained an employee after his Employment Agreement was terminated because he continued to work for CEMEX under the Consulting Agreement and because he had continuing obligations under the Employment Agreement. He also argued that CEMEX should be equitably estopped from taking the position that his EEOC charge was not timely filed based on the nondisparagement clause in his Employment Agreement. (Docket Entry No. 24, at 4–5).

Although CEMEX clearly argued untimeliness as a bar to any ADEA claim over the 2009 termination in its motion for summary judgment, Branch did not refer to this claim, or argue for equitable tolling of the deadline, until his surreply to CEMEX's reply to Branch's response to CEMEX's motion. In his response to CEMEX's summary judgment motion, Branch did not refer to equitable tolling or equitable estoppel to avoid the limitations bar. Legal arguments raised for the

first time in a surreply, like arguments raised for the first time in a reply, are waived.[7] *United States v. All Assets Held at Bank Julius Baer & Co.*, 772 F. Supp. 2d 205, 215 (D.D.C. 2011); *see also Conway v. United States*, 647 F.3d 228, 237 n.8 (5th Cir. 2011) ("Arguments raised for the first time in a reply brief are forfeited."); *accord, e.g.*, *Murthy v. Abbott Labs.*, — F. Supp. 2d —, 2012 WL 734149, at *13 n.9 (S.D. Tex. 2012); *Tellabs Operations, Inc. v. Fujitsu Ltd.*, — F.R.D. —, 2012 WL 1520333, at *5 (N.D. Ill. 2012); *Iteld, Bernstein & Assocs., LLC v. Hanover Ins. Grp.*, Civ. A. No. 06-3418, 2009 WL 2496552, at *4 (E.D. La. Aug. 12, 2009).   A surreply, when allowed, "is limited to addressing only new arguments raised for the first time by the opposing party in their reply briefing and not included in the original motion."   *Marbury Law Grp., PLLC v. Carl*, 729 F. Supp. 2d 78, 83 (D.D.C. 2010).  In the interests of thorough analysis, however, Branch's equitable-exception arguments are analyzed on the merits.

On December 23, 2008, CEMEX notified Branch in writing that his employment would be terminated when his Employment Agreement expired on July 1, 2009.  (Docket Entry No. 20, Ex. B).  The December 2008 letter clearly stated that Branch's employment as regional manager would end on July 1, 2009.  (Docket Entry No. 20, Ex. C, at 43–44; *see also id.*, at 104).  Although Branch argues that he believed he continued to work as an employee until December 31, 2010 (when he received his last severance payment and when the continuing obligations under the Employment Agreement expired), that is inconsistent with the December 2008 letter, with the July 2009 companywide e-mail announcing his retirement, and with the fact that Branch in August 2009 submitted a Benefit Election Form to receive his pension.  (Docket Entry No. 20, Ex. K).  Branch testified that he knew he was ineligible to receive his pension until his employment ended.  (Docket

---

[7]Indeed, as one district court in this circuit has explained, "[s]urreplies are heavily disfavored by courts." *Weems v. Hodnett*, No. 10-CV-1452, 2011 WL 2731263, at *1 (W.D. La. July 13, 2011).

Entry No. 20, Ex. C, at 75–76).  The 300-day limitations period began on December 23, 2008, when Branch was unambiguously informed of the decision to terminate his Employment Agreement effective July 1, 2009.  *See Phillips*, 658 F.3d at 456.  As a matter of law, based on the undisputed evidence, Branch reasonably should have known on December 23, 2008 that his employment would end effective July 1, 2009.  *See id.* at 456.

Even if the court delayed the date when limitations began to July 1, 2009, Branch is still too late; he did not file his EEOC age discrimination charge until January 5, 2011.  (Docket Entry No. 20, Ex. F).  On July 1, 2009, Branch clearly knew that his employment had been terminated.  On that date, CEMEX e-mailed all employees of the concrete pipe division, including Branch, informing them that he had retired and that Metzger was assuming the regional-manager position.  (Docket Entry No. 20, Ex. J; *see also* Docket Entry No. 20, Ex. C, at 59–60).  Branch's ADEA claim based on the 2009 termination of his Employment Agreement is untimely unless equitable tolling or equitable estoppel applies.

Equitable tolling "is a narrow exception" to "be applied sparingly." *Phillips*, 658 F.3d at 457 (internal quotation marks omitted).  The employee has the burden of demonstrating entitlement to equitable tolling. *Id.* at 458.  The Fifth Circuit recognizes three general grounds for equitable tolling in this context: "(1) a pending action between parties in the wrong forum; (2) the plaintiff's unawareness of the facts supporting his claim because defendant intentionally concealed them; and (3) the EEOC's misleading the plaintiff about his rights." *Id.* at 457.

The undisputed facts in the record show that, as a matter of law, Branch is not entitled to equitable tolling.  In *Phillips*, 658 F.3d at 453–55, the Fifth Circuit held that an employer who unambiguously terminates an employee and then rehires that employee to a temporary job does not entitle that employee to equitable tolling of a discrimination claim based on the termination from

the permanent position. *Id.* at 458. In *Phillips*, the plaintiff-employee learned in June 2007 that her employment was being terminated effective July 30, 2007. In August 2007, the defendant-employer offered the employee a temporary job similar to her previous position. The employee accepted. The employer then terminated her from this temporary job in January 2008. The employee believed that age discrimination was the reason for the termination of her permanent job. She did not file an EEOC charge, however, until March 2008. In December 2008, she sued, asserting an ADEA claim for the termination of her permanent job. The district court concluded that the employee "did not experience an adverse employment action" until the termination of her temporary job in January 2008 or, alternatively, that she was entitled to equitable tolling based on the employer's actions. The Fifth Circuit reversed, holding that the ADEA claim was untimely because the employee had unambiguously learned in June 2007 that her permanent job was being terminated effective the following month. *See id.* at 456–57. The fact that the employer immediately hired the employee to work in a new, temporary position did not entitle her to equitable tolling of the limitations period for filing an ADEA claim over the termination of her employment from the permanent position. Her recall to the new position was for "temporary and not for permanent employment. The nature and status of [the plaintiff's] temporary employment may have created an awkward situation for filing an EEOC claim, but it was not ambiguous." *Id.* at 458.

Similarly, Branch clearly knew on December 23, 2008 that his Employment Agreement would be terminated in six months and his position as regional manager would end at that time. Branch testified that he believed when he received the December 2008 letter that the reason for the termination was his age. (Docket Entry No. 20, Ex. C, at 47). When CEMEX notified Branch in December 2008 of its decision to terminate his employment as regional manager, he had all the facts necessary to file an ADEA charge over that decision. *See id.* at 457. Although Branch understood

that CEMEX had planned to offer him a Consulting Agreement after terminating his Employment Agreement, it was clear in December 2008 that CEMEX had decided to terminate his employment as regional manager effective July 1, 2009.  *See id.* at 458.  *Phillips* forecloses Branch's equitable-tolling argument.

Branch's equitable estoppel argument is also unavailing.  Equitable estoppel applies to bar a defendant from asserting untimeliness "where its conduct induced a plaintiff to refrain from exercising its rights."  *Id.* (internal quotation marks omitted).  Branch points to the December 2008 termination letter's reminder that certain obligations in his Employment Agreement, including the nondisparagement clause, continued to apply through December 31, 2010.  According to Branch, if he had "accused Defendants of age discrimination such would be considered disparaging." (Docket Entry No. 24, at 4–5).  Branch cites no authority for his argument that asserting a protected federal right under the ADEA would be disparagement of the sort covered in the Employment Agreement.  To the contrary, had Branch timely filed an EEOC charge over the termination of his Employment Agreement during the time he was working as a consultant, and CEMEX had taken adverse action on the basis that Branch violated the Agreement's antidisparagement provision by filing the charge, Branch would likely have a retaliation claim.  At most, as in *Phillips*, Branch might have faced a "difficult choice" as to whether to file an EEOC charge over the termination of his employment while he was working as a consultant for the same company.  In *Phillips*, a similar difficult choice did not provide a basis for equitable relief from the limitations bar.  *Id.* at 456.

Branch did not timely file an EEOC charge over his 2009 employment termination. Neither equitable tolling nor equitable estoppel applies.  CEMEX is entitled to summary judgment on the ADEA claim arising from the 2009 termination of Branch's Employment Agreement and his employment as regional manager.

20

### 2.   The 2010 Termination of Branch's Consulting Agreement

CEMEX asserts three grounds for granting summary judgment on Branch's ADEA claim arising from the 2010 decision to terminate the Consulting Agreement.  First, under the Consulting Agreement, Branch was acting as an independent contractor and not covered by the ADEA.  Second, Branch did not timely file this claim with the EEOC.  Third, Branch has not demonstrated sufficient summary judgment evidence of pretext.  CEMEX raised a fourth argument in its reply brief: that Branch failed to raise this claim in the EEOC charge.  Each argument is analyzed below, beginning with the exhaustion argument.

#### a.   Administrative Exhaustion

In its reply brief, CEMEX for the first time[8] argued that the scope of Branch's EEOC charge does not extend to an age-discrimination claim relating to the 2010 termination of the Consulting Agreement.  (*See* Docket Entry No. 22, at 2–4).  As with Branch's equitable-exceptions arguments, this argument is likely waived.  *See, e.g.*, *Murthy*, 2012 WL 734149, at *13 n.9.  As with Branch's equitable-exception argument, the court nonetheless addresses this argument on the merits.[9]

The Fifth Circuit instructs district courts to "construe[] an EEOC complaint broadly but in terms of the administrative EEOC investigation that can reasonably be expected to grow out of the charge of discrimination."  *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008).

---

[8]CEMEX may claim that it raised the argument in a one-sentence footnote in its summary judgment motion. (Docket Entry No. 20, at 13 n.42).  "Arguments that are insufficiently addressed in the body of the brief, however, are waived." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 n.7 (5th Cir. 2003); *see also, e.g.*, *Behrend v. Comcast Corp.*, Civ. A. No. 03-6604, 2012 WL 1231794, at *19 n.31 (E.D. Pa. Apr. 12, 2012) (finding arguments raised perfunctorily in a footnote to be waived); *Shailja Gandhi Revocable Trust v. Sitara Capital Mgmt., LLC*, No. 09 C 3141, 2011 WL 814647, at *4 (N.D. Ill. Feb. 25, 2011) ("Generally, arguments raised only in footnotes are waived."). CEMEX's one-sentence footnote briefly mentioning the issue in its motion for summary judgment is insufficient to raise the issue.

[9]The Fifth Circuit has not resolved whether administrative exhaustion is a jurisdictional requirement or if it is a prerequisite to suit subject to waiver.  *See Pacheco v. Mineta*, 448 F.3d 783, 788 n.7 (5th Cir. 2006).  Because Branch did exhaust his administrative remedies, this court need not weigh in on the dispute.

(internal quotation marks omitted). In doing so, a court is not confined to the charge's four corners. *Id.* An ADEA lawsuit "may include allegations like or related to allegations contained in the EEOC charge and growing out of such allegations during the pendency of the case before the Commission." *Id.* (internal quotation marks and alterations omitted).

     In relevant part, the charge (which names "RINKER-CEMEX" as the employer) reads:

> I began my employment on January 5, 1985, General Manager and was promoted to Regional Manager in 1987. I remained in that capacity up until my discharge on December 31, 2010. Throughout 2009, I was asked by Francisco Aguilar (President) whether or not I was going to continue my employment or retire. I also made it clear to him that I wanted to work for 2 to 3 more years, so long as my health would allow it. In June 2010, I was advised by Mr. Aguilar that my contract with Rinker would expire on December 31, 2010 and it would not be renewed.

(Docket Entry No. 20, Ex. F). Branch concluded that age discrimination was the reason for the June 2010 action. (*Id.*).

     The charge does not refer explicitly to CEMEX's termination of Branch's Employment Agreement or his Consulting Agreement. But the charge clearly identifies the decision to end Branch's work for CEMEX, whether under the Employment Agreement or the Consulting Agreement, as the basis of the age discrimination claim. In responding to the EEOC investigation, CEMEX made clear its understanding that the scope of the charge extended to Branch's termination under both Agreements. In a February 2011 letter responding to the EEOC charge, Roberson concluded that Branch "was terminated per the clear terms of his Employment *and* Consulting Agreements." (Docket Entry No. 21, Ex. N, at 2 (emphasis added)). An April 2011 e-mail from the EEOC investigator to Branch confirmed that the investigation was into both decisions. (*See* Docket Entry No. 20, Ex. P). Branch exhausted his administrative remedies with respect to his claim arising out of the end of the Consulting Agreement.

22

### b.    Independent Contractor

CEMEX argues that Branch may not bring an ADEA claim over the termination of his Consulting Agreement because Branch, under that Agreement, acted as an independent contractor and not an employee.  (Docket Entry No. 20, at 13–15).  CEMEX points to a provision in the Consulting Agreement stating that Branch was "to be retained . . . as an independent contractor, and not as an employee."  (Docket Entry No. 20, Ex. I, ¶ 1).  Branch responds that he nonetheless was an employee of CEMEX, not an independent contractor, under the Fifth Circuit's hybrid economic-realities and control test.  (*See* Docket Entry No. 21, at 6–14).

The law is clear that the ADEA only protects employees; it does not extend to independent contractors.  *Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 753 (5th Cir. 1983); *accord, e.g.*, *Ernster v. Luxco, Inc.*, 596 F.3d 1000, 1003 (8th Cir. 2010).  To determine whether a person is an employee or an independent contractor, the Fifth Circuit "us[es] a hybrid economic realities/common law control test[.]"  *Hathcock v. Acme Truck Lines, Inc.*, 262 F.3d 522, 526 (5th Cir. 2001).  "The most important component of this test is the right to control the alleged employee's conduct."  *In re Pilgrim's Pride Corp.*, 453 B.R. 684, 688 (N.D. Tex. 2011) (citing *Deal v. State Farm Cnty. Mut. Ins. Co. of Tex.*, 5 F.3d 117, 119 (5th Cir. 1993)).  The control component "focuse[s] on whether the alleged employer has the right to hire, fire, supervise, and set the work schedule of the employee."  *Muhammad v. Dallas Cnty. Cmty. Supervision & Corr. Dep't*, 479 F.3d 377, 380 (5th Cir. 2007) (internal quotation marks omitted).  The economic-realities component "focuses on whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment."  *Id.* (internal quotation marks omitted).  Other factors courts examine are:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Pilgrim's Pride*, 453 B.R. at 688 (quoting *Fields v. Hallsvile Indep. Sch. Dist.*, 906 F.2d 1017, 1020 n.4 (5th Cir. 1990)). "The 'hybrid economic realities/common law control test' is necessarily a fact-specific inquiry[.]" *Muhammad*, 479 F.3d at 382.

Branch testified that, under the Consulting Agreement, CEMEX "basically controlled what I did and told me what to do[.]" (Docket Entry No. 20, Ex. C, at 141). But the evidence shows that although CEMEX made a list of tasks for Branch to carry out under the Consulting Agreement and also requested specific tasks, it did not specify how Branch should complete them, other than to set a 50-hour-per-month target limit. (*See* Docket Entry No. 21, Ex. I; *see also* Docket Entry No. 20, Ex. G, at 75–83). Instead, Branch had significant discretion. For example, Metzger testified that if Branch thought it "more important" to work on some task outside the office instead of attending the CEMEX weekly meeting, then he was free to do so. (Docket Entry No. 20, Ex. G, at 94). In at least one instance, Branch did not complete a task CEMEX requested because he found it "asinine." (Docket Entry No. 20, Ex. C, at 65). Branch testified that he did not carry out the main task of the Consulting Agreement, to help his customers in the transition to working with Metzger, who replaced him as regional manager, or other CEMEX sales representatives. (*Id.*, at 91–92).

The evidence as to the economic-realities component of the test is similar.  CEMEX drafted the Consulting Agreement and set its terms and conditions.  It also paid Branch under the Consulting Agreement.  But CEMEX did not pay Branch benefits under the Agreement.  (Docket Entry No. 20, Ex. I, ¶ 3).  Nor did CEMEX withhold taxes when paying him.  (*See* Docket Entry No. 20, Ex. C, at 132–34).  This evidence appears to weigh in favor of independent-contractor status.

The Consulting Agreement clearly states that Branch is an independent contractor and not an employee.  *See Craft-Palmer v. State Farm Ins. Co.*, 157 F.3d 903, 1998 WL 612388, at *1 (5th Cir. Aug. 27, 1998) (per curiam) (a contract's identification of a person as an independent contractor, and not as an employee, is evidence of independent-contractor status); *Pilgrim's Pride*, 453 B.R. at 688 (same).[10]  The fact that Branch was to work for a fixed term points in favor of independent-contractor status.  *See Newcomb v. N. E. Ins. Co.*, 721 F.2d 1016, 1017 (5th Cir. 1983); *Sherwood v. Evans*, 422 F. Supp. 2d 181, 186 (D.D.C. 2006).  Although the nature of the work Branch performed under the Consulting Agreement was the same as the work he had performed for years under the Employment Agreement—Branch also used the same office and equipment—he was to work up to a target limit of 50 hours each month as a consultant.

In sum, although there is evidence that Branch was an independent contractor under the Consulting Agreement, there is also some evidence supporting employee status.  Under such circumstances, applying the presumption of allowing the jury to decide this fact-intensive question may be appropriate.  *See Hathcock*, 262 F.3d at 527; *see also Worth v. Tyer*, 276 F.3d 249, 264 (7th Cir. 2001) (holding that a district court did not err in denying summary judgment to an employer on the basis of independent-contractor status when "there was sufficient evidence for the jury to

---

[10]The fact that a person contractually agrees to be an independent contractor does not establish such status. *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 346 (5th Cir. 2008).

conclude that [the plaintiff] was an employee"). Even if summary judgment is inappropriate on the basis that Branch was acting as an independent contractor under the Consulting Agreement, however, CEMEX is entitled to summary judgment on other grounds.

### c.   Timeliness of the EEOC Charge

CEMEX argues that Branch's EEOC discrimination charge was untimely.  According to CEMEX, the Consulting Agreement expressly stated that it was to terminate after one year. "Therefore, if [Branch] believed that arrangement was discriminatory, the time period for filing a charge of discrimination would  have begun when he signed it on July 1, 2009, or 553 days before he actually filed his EEOC charge of discrimination."  (Docket Entry No. 20, at 15).  Branch responds that the limitations period did not begin until April 30, 2010, when CEMEX told him that it no longer required his consulting services, because CEMEX had earlier proposed that the one-year Consulting Agreement would be "subject to extension if mutually agreeable."  (Docket Entry No. 20, Ex. B).  CEMEX replies that the Consulting Agreement's merger clause, in combination with the parol-evidence rule, precludes this court from considering the alleged understanding between Branch and CEMEX that the Consulting Agreement could be renewed when the one-year term expired.  (*See* Docket Entry No. 22, at 4–5).

"The parol evidence rule applies when parties have a valid, integrated written agreement, and precludes enforcement of prior or contemporaneous agreements."  *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011).  "The rule particularly applies when the written contract includes a merger clause or similar language." *Audubon Indem. Co. v. Custom Site-Prep, Inc.*, 358 S.W.3d 309, 316 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).  But "[t]he rule does not prohibit consideration of surrounding circumstances that inform, rather than vary or contradict, the contract text." *Houston Exploration Co.*, 352 S.W.3d at 469.  The

26

extent of an agreement's integration is a matter of law for the court to decide.  *See Morgan Bldgs. & Spas, Inc. v. Humane Soc'y of Se. Tex.*, 249 S.W.3d 480, 486 (Tex. App.—Beaumont 2008, no pet.) (citing *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731–32 (Tex. 1981)).  "A partially integrated agreement is a final and complete expression of all the terms addressed in that written agreement, but is not a final and complete expression of all the terms the parties have agreed upon." *Royce Homes, L.P. v. Bates*, 315 S.W.3d 77, 88 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (quoting *Morgan Bldgs.*, 249 S.W.3d at 486).

The first paragraph of the Consulting Agreement states that "[b]eginning July 2, 2009 through July 1, 2010 (the 'Consulting Term'), [CEMEX] hereby retains [Branch]" as a consultant. (Docket Entry No. 20, Ex. I, ¶ 1).  The Agreement is silent on whether the Consulting Term can be renewed.  According to Branch, the parties' alleged understanding that the Consulting Agreement could be renewed does not vary or contradict the contractual terms because no term addresses renewal.  But the Agreement plainly and unambiguously states that it begins on July 2, 2009  and ends on July 1, 2010.  Branch would rewrite this provision so that, rather than reading "beginning July 2, 2009 through July 1, 2010," it would instead read "beginning July 2, 2009 through July 1, 2010, unless renewed by the parties."  By its clear terms, the Consulting Agreement expired on July 1, 2010.  For the Agreement to be renewed for another year or extended beyond July 1, 2010, the parties would have had to amend it in writing, (*see id.*, ¶ 9), or sign a new agreement with an new Consulting Term.

The Consulting Agreement's merger clause states in part that the terms "supersede[] all prior agreements or understandings, written or oral concerning the subject matter thereof."  (*Id.*).  The Consulting Agreement is integrated with respect to when it would expire: July 1, 2010.  Parol

27

evidence that it could be renewed changes this term of the Agreement.  *See Houston Exploration Co.*, 352 S.W.3d at 469.

The competent summary judgment evidence includes the December 2008 letter stating, in part, that CEMEX was contemplating a consulting agreement that had a one-year term "subject to extension if mutually agreeable."  This evidence does not raise a fact issue precluding summary judgment on the basis of the untimely EEOC charge.  On July 1, 2009, Branch was informed that the Consulting Agreement would expire on July 1, 2010.  *See Phillips*, 658 F.3d at 456.  To the extent Branch believed that the decision to replace his Employment Agreement with a one-year Consulting Agreement was motivated by age discrimination, he was required to file his EEOC charge within 300 days of signing the Consulting Agreement.  Branch, however, waited nearly 18 months before filing his EEOC charge.  That makes his ADEA claim over the one-year term of the Consulting Agreement untimely.

Even assuming, however, that Branch timely filed his EEOC charge over CEMEX's decision not to renew or extend the Consulting Agreement, CEMEX remains entitled to summary judgment on this claim.  As set out in detail below, Branch has neither identified nor presented summary judgment evidence of pretext that raises a disputed fact issue material to determining whether CEMEX's decision was motivated by age discrimination.

### d.  Pretext

The familiar *McDonnell Douglas* framework applies to ADEA claims that are based on circumstantial evidence of age discrimination (as most are).  *See Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010).  The employee first bears the burden of establishing a *prima facie* case of age discrimination.  *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012).  To do so, the employee "must show she was [1] discharged; [2] qualified for the

position; [3] within the protected age group at the time of the discharge; and [4] either replaced by someone younger, replaced by someone outside the protected class, or otherwise discharged because of her age." *Phillips*, 658 F.3d at 455. Though this burden "is not onerous," it is an important requirement because "the prima facie case raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Turner v. Kan. City. S. Ry. Co.*, 675 F.3d 887, 892 (5th Cir. 2012) (quoting *Tex Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 254 (1981)) (internal quotation marks omitted). Once the employee makes a *prima facie* showing, "the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (internal quotation marks omitted). Finally, the burden shifts back to the employee "to show that the reason given is merely pretextual." *Id.* "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id.* (internal quotation marks omitted). At the summary judgment stage, the employee must only show the existence of a genuine issue of material fact regarding pretext.[11] *Id.* In conducting a pretext analysis, this court must not "engage in second-guessing of an employer's business decisions." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007). The employee must show more than that the adverse employment action was improperly or incorrectly made. *See id.*

CEMEX does not argue that Branch has failed to make a *prima facie* showing of age discrimination. CEMEX has met its burden of producing legitimate, nondiscriminatory reasons for its decision not to renew Branch's Consulting Agreement when it expired. In his deposition,

---

[11]Ultimately, of course, the plaintiff "must prove by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employer decision." *Moss*, 610 F.3d at 922 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)).

Aguilera explained that during a meeting that included members of CEMEX's cement division, Branch "made a derogatory comment about one of the top executives for one of our largest customers in cement."  Branch called this executive "a snake," which Aguilera found "completely not appropriate."  (Docket Entry No. 20, Ex. H, at 67).  Aguilera also testified that Branch was not carrying out the Consulting Agreement's purpose of providing support for CEMEX and its customers in the transition from working with him to working with other CEMEX employees. Aguilera noted that Branch was repeatedly visiting the same customers and not bringing in other CEMEX sales representatives.  Aguilera also noted that, months after Branch's consultancy had begun, he  had yet to develop a transition plan.  Finally, Aguilera had heard reports that Branch was criticizing CEMEX to competitors and was planning to compete against CEMEX, both of which would violate the ongoing obligations of the Employment Agreement.  (*See id.*, at 67–71).

Branch argues that these proffered reasons are false and a pretext for age discrimination.  The evidence he cites, however, relates to the 2009 termination of his Employment Agreement, not to the 2010 decisions to end his services under the Consulting Agreement. Branch first argues that two other employees who were over 40 years old—Ron Metzger and Mike Shook—were "targeted for termination near the time Mr. Branch's employment contract was terminated[.]"  (Docket Entry No. 21, at 21).  Branch relies on one sentence in a July 2008 e-mail from Aguilera to Roberson about initiating the process for terminating Branch's Employment Agreement.  The one sentence reads in full: "We still have Ron's, and Mike Shook's contracts which should be next on the list."  (Docket Entry No. 21, Ex. H).  Branch has not identified or presented any evidence as to whether any action was taken on the contracts for Metzger or Shook.  Indeed, the evidence is undisputed that as of the date of the summary judgment briefs, Metzger continued to work for CEMEX.  This e-mail, moreover, was sent over 18 months before the decisions to end Branch's consulting work.

Second, Branch faults Aguilera for not including CEMEX's planned reduction in force in that same e-mail to Roberson.  (*See* Docket Entry No. 21, at 23).  The reduction in force, however, was one of the reasons Aguilera gave for deciding to terminate Branch's Employment Agreement. (*See* Docket Entry No. 20, Ex. H, at 42, 52–58).  Aguilera provided different reasons, listed above, for the later decision not to renew Branch's Consulting Agreement.  (*See id.*, at 67–74).

Branch denies that he displayed a loss of commitment to the job, (*see* Docket Entry No. 21, at 21, 23).  This reason was also given in connection with the decision to terminate Branch's Employment Agreement, not the Consulting Agreement.  (*See* Docket Entry No. 20, Ex. H, at 42–51).

Branch does dispute that he had performed poorly under the Consulting Agreement and asserts that Aguilera did not communicate any criticisms to him, as CEMEX's rules and policies called for.[12]  (*See* Docket Entry No. 21, at 23; Docket Entry No. 24, at 4).  But that assertion ignores Aguilera's testimony that after the meeting in which Branch called a customer's executive "a snake," Aguilera took him aside and told him it was inappropriate.[13]  (Docket Entry No. 20, Ex. H, at 74). In addition, if Branch was an independent contractor under the Consulting Agreement, as CEMEX asserts, it is unclear that CEMEX's policy of open communication with employees applies. Regardless, Aguilera's failure to communicate more openly with Branch about his performance deficiencies "may be a management lapse, but it does not amount to evidence of" age discrimination. *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 326 (5th Cir. 2002).

---

[12]According to the CEMEX Code of Ethics and Business Conduct: "To encourage communication, we . . . [e]xpress our ideas and concerns clearly and honestly in a timely and responsible manner, and contribute constructive criticism in order to make our relations and processes more efficient."  (Docket Entry No. 21, Ex. Q, ¶ 2.4).

[13]With respect to the termination of the Employment Agreement, both Aguilera and Metzger testified that they each communicated concerns about his work performance directly to Branch.  (Docket Entry No. 20, Ex. G, at 50–51; Ex. H, at 42).

Branch also contends that the reasons Aguilera identified in his deposition do not appear in the contemporaneous documents relating to the termination of the Consulting Agreement or in CEMEX's response to the EEOC charge. (*See* Docket Entry No. 21, at 23–24; Docket Entry No. 24, at 4). "It is well established that, when an employer offers shifting, inconsistent or conflicting reasons for its actions, such inconsistency may give rise to an inference of pretext." *Quintana v. ADC Telecomms., Inc.*, No. EP-09-CV-110-KC, 2010 WL 2038302, at *6 (W.D. Tex. May 19, 2010) (citing *Wright v. West*, 505 U.S. 277, 296 (1992)); *see also Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007) ("A court may infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct."). None of the reasons Aguilera identified in his deposition for ending Branch's consulting work and not renewing the Consulting Agreement conflict with the contemporaneous documents. Although the record contains some contemporaneous discussions of Branch's performance under the Employment Agreement, (*see, e.g.*, Docket Entry No. 21, Ex. H), it does not contain such discussions of his performance under the Consulting Agreement. CEMEX's response to the EEOC charge focused almost entirely on the reasons for terminating the Employment Agreement. (*See* Docket Entry No. 21, Ex. N). Branch asserts that Aguilera created the reasons for ending the consulting arrangement after the fact. That assertion ignores Branch's own testimony about the work he did under that Agreement. Branch testified that he refused to carry out some of the tasks CEMEX assigned under the Consulting Agreement, tasks that were clearly part of the Consulting Agreement's transition purpose. Branch refused to prepare a list of customers and a plan to enhance the relationship between those customers and Metzger because he believed the tasks to be "asinine." (Docket Entry No. 20, Ex. C, at 65). Branch did not prepare a call plan for customers because he did not believe it to be "necessary." (*Id.*, at 66). And Branch did not work on his customers' transition to working with Metzger or other CEMEX sales

representatives, which was the main purpose of the Consulting Agreement, giving as his reason that neither Metzger nor other CEMEX employees specifically asked him to do so.  (*Id.*, at 91–92).  Branch's testimony describing his own performance is consistent with Aguilera's criticisms of the deficiencies that were part of the reason for deciding to end the Consulting Agreement.

Finally, Branch makes much of remarks by coworkers, some of which were allegedly made in Metzger's presence, that he had "white hair" and was an "old gray fox."  (Docket Entry No. 21, at 24).  "Comments in the workplace can only provide evidence of discrimination if they demonstrate discriminatory animus and are made by a person primarily responsible for the adverse employment action or by a person with influence over the formal decisionmaker."  *Hill v. New Alenco Windows, Ltd.*, 716 F. Supp. 2d 582, 597 (S.D. Tex. 2009) (citing three Fifth Circuit cases, including *Bergquist v. Wash. Mut. Bank*, 500 F.3d 344, 351 (5th Cir. 2007)).[14]  There is no suggestion that these comments were made by a decisionmaker or someone with influence over the decisionmaker.  The fact that some of the comments were made in Metzger's presence does not make them his and, by itself, does not make them probative evidence of his animus.  *See Weinert v. Vill. of Lemont Police Dep't*, — F. Supp. 2d —, 2012 WL 698352, at *5–6 (N.D. Ill. 2012) (citing *La Montagne v. Am. Convenience Prods., Inc.*, 750 F.2d 1405 (7th Cir. 1984)) (holding that an alleged discriminatory remark by a nondecisionmaker to the decisionmaker does not create sufficient evidence of pretext to survive summary judgment); *PAS Comms., Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1183 & n.42 (D. Kan. 2001) (holding that a discriminatory remark made in the presence of a decisionmaker does not provide evidence of pretext).  Moreover, Branch has submitted no

---

[14]The four-prong test Branch cited in his response, (Docket Entry No. 21, at 24), applies only when "the comments are advanced as direct evidence of discrimination apart from the McDonnell Douglas framework."  *Hill*, 716 F. Supp. 2d at 597 n.8.  Branch, however, uses the remarks "[a]s further evidence that Defendants were motivated by discriminatory animus"—in other words, as part of the *McDonnell Douglas* framework.  (Docket Entry No. 21, at 24).  The result, however, would be no different even were the court to apply the four-prong test.

evidence—aside from his unsubstantiated assertion—that Metzger influenced the decision to terminate his Consulting Agreement. In fact, Metzger testified that he encouraged Aguilera to renew the agreement, but Aguilera decided otherwise. (Docket Entry No. 20, Ex. G, at 63).

This leaves the three legitimate, nondiscriminatory reasons Aguilera cited for terminating and not renewing Branch's Consulting Agreement: (1) Branch made a highly inappropriate comment during a work meeting about a top customer; (2) Branch was not adequately performing under the Consulting Agreement; and (3) CEMEX had heard reports that Branch was criticizing CEMEX to competitors and talking about plans to compete against CEMEX, both in violation of his Employment Agreement. Branch has not denied that he made the inappropriate remark in the meeting. Branch has not identified or presented summary judgment evidence showing that CEMEX's belief that he was not effectively implementing the plan to support his customers in the transition toward working with other CEMEX sales representatives was unreasonable or in bad faith. *See LeMaire*, 480 F.3d at 391. To the contrary, Branch testified that he did not work on the transition. Nor has Branch identified or presented summary judgment evidence controverting the testimony that Aguilera had heard reports of Branch's discussions with CEMEX competitors and his plans to compete with CEMEX.

In sum, Branch has not presented evidence of pretext that gives rise to a genuine fact dispute material to determining that his Consulting Agreement was terminated because of his age. Even assuming that there are disputed fact issues as to whether Branch was an independent contractor under the Consulting Agreement and that the EEOC charge over the decision not to renew this agreement was timely made, CEMEX is entitled to summary judgment on this ADEA claim.

**B.     The Fraud and Fraudulent-Inducement Claims**

34

Finally, CEMEX has moved for summary judgment on Branch's fraud and fraudulent-inducement claims. Branch bases these claims on CEMEX's representation to Branch that he would remain an employee of the company even after signing the Consulting Agreement, which induced him to sign. (Docket Entry No. 4, ¶ 11). An element of fraud and fraudulent inducement is that the plaintiff actually and justifiably relied on the alleged misrepresentation. *See LeTourneau Techs. Drilling Sys., Inc. v. Nomac Drilling, LLC*, 676 F. Supp. 2d 534, 542 (S.D. Tex. 2009) (citing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001); *Haese v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001)). "Reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." *Id.*; *accord, e.g.*, *Allen v. Devon Energy Holdings, L.L.C.*, — S.W.3d —, 2012 WL 880623, at *17 (Tex. App—Houston [1st Dist.] 2012, pet. filed). The first paragraph of the Consulting Agreement states that "Consultant hereby agrees to be retained by Company, as an independent contractor, and not as an employee." (Docket Entry No. 20, Ex. I, ¶ 1). Even taking as true Branch's assertion that CEMEX represented that he would remain an employee under the Consulting Agreement, reliance by Branch on that representation is unjustifiable as a matter of law. Because the alleged representation cannot form the basis of a fraud or fraudulent-inducement claim, CEMEX is entitled to summary judgment on these claims as well.

## IV.   Conclusion

CEMEX's motion for summary judgment, (Docket Entry No. 20), is granted. Its motion to strike certain summary judgment evidence, (Docket Entry No. 23), is denied as moot. Final judgment is entered by separate order.

SIGNED on June 20, 2012, at Houston, Texas.

Lee H. Rosenthal

Lee H. Rosenthal
United States District Judge